IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09 C 2392 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Charles Smith, seeks judicial review of a final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying Plaintiff

disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423,

and supplemental security income ("SSI") under Title XVI, 42 U.S.C. § 1381(a). Before this

Court are Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary

Judgment. The parties have consented to have this Court conduct any and all proceedings in this

case, including the entry of final judgment pursuant to 28 U.S.C. § 636(c) and

N.D. Ill. R. 73.1(c). For the reasons set forth below, this Court affirms the Commissioner's

decision in part, reverses in part, and remands the case for further proceedings consistent with

this opinion.

# I.  Procedural History

Plaintiff filed for SSI on June 30, 2004 and DIB on July 15, 2004, alleging in both cases that he had become disabled on January 31, 2003.[1]  (R. at 32, 299.)  Plaintiff's applications were both denied, initially on October 26, 2004, (R. at 32, 299), and again upon reconsideration on March 7, 2005.  (R. at 33, 305).  Plaintiff thereafter submitted a timely request for a hearing by an administrative law judge ("ALJ").  (R. at 45.)  The hearing was held on April 9, 2008,[2] and on May 22, 2008 ALJ Regina M. Kossek issued a decision, concluding that Plaintiff was not disabled.  (R. at 17, 29–30.)  The Appeals Council denied Plaintiff's request for review on March 17, 2009.  (R. at 5.)  Plaintiff now appeals from the decision.

# II.  Factual Background

## A.  Biography and Work History

Plaintiff was born on April 1, 1962.  (R. at 32, 299.)  In 1978, when Plaintiff was fifteen years old, he intervened in a domestic dispute between his mother and step-father.  (R. at 270.)  In response, Plaintiff's step-father retrieved a shotgun and shot him, causing an injury to his right forearm.  (R. at 149, 270.)  Since then, he has received treatment for this injury on numerous occasions, as discussed in detail below.

---

[1] The filing dates for Plaintiff's claims and the dates on which his claims were denied are inconsistently cited in the administrative law judge's decision and the parties' briefs to this Court. These errors do not affect the merits of Plaintiff's claim and are noted here only to clarify the record.

[2] The ALJ's decision refers to the hearing on April 9, 2008, in which the majority of this case's testimony was given by Plaintiff and various experts.  Prior hearings were also held on February 5, and July 7, 2007.  (R. at 310, 328.)  For simplicity, this opinion also treats these hearings collectively unless otherwise specified.

Plaintiff graduated from high school and attended two years of college at Kennedy King College, studying business and earning his Associate's Degree. (R. at 269, 353.) According to Plaintiff, he also studied some accounting. (R. at 353.) Plaintiff was intermittently employed between 1980 and 1985 and held various jobs, including work as a cashier (1980), automobile salesman (1982), and parking-lot attendant (1983–84). (R. at 135.) Between 1985 and 1998, Plaintiff worked as a color proofer for a graphic design company. (*Id.*) In 1998, Plaintiff was employed by Illinois Bell as a customer service representative and worked until 1992. (*Id.*) From 1993 to 1997, Plaintiff again held various jobs, including that of a mail sorter, an assistant manager, and a bookkeeper. (R. at 135, 270.) In 1997, he began employment at Van Rue Credit Corporation, a collection agency, where he worked in customer service for six years. (*Id.*) Plaintiff's employment at Van Rue ended in January 2003. (R. at 149.)

On April 26, 2004, Plaintiff was received by the Olive Branch Mission as a homeless individual without income. (R. at 129.) He thereafter filed for SSI and DIB, alleging that he became disabled on January 31, 2003. (R. at 32, 299.) He was forty years old at the time of the alleged onset date. (R. at 28.) Plaintiff did not work again until July 2005, at which time he started work as a telephone customer service operator for another collection agency; he was terminated nine months later. (R. at 69, 135, 354.) Also in 2007, Plaintiff worked for a short period at H&R Block, where he helped prepare tax returns for others. (R. at 355.) He regularly attends church and participates in a weekly Bible study group. (R. at 388.) He currently lives with his aunt and frequently interacts with his family. (R. at 377, 386.)

**B.     Medical Evidence**

1.     History of Medical Procedures and Treatment

Plaintiff sustained a gunshot wound to his right forearm in 1978. (R. at 151.) He was treated at a hospital and underwent surgery a few days later. (*Id.*) In 1995, Plaintiff underwent open reduction and internal fixation surgery on his right wrist, where part of his left hip was used as a bone graft. (R. at 151, 177.) After the surgery, Plaintiff received physical therapy until 1997. (R. at 151.)

In July 2004, Plaintiff once again began seeking medical treatment, complaining of pain in his right shoulder extending down to his right wrist. (R. at 141.) Plaintiff was referred to occupational therapy to relieve his pain in July 2004, but he did not begin treatment until December 2004. (R. at 143, 148.) Plaintiff received therapy on thirteen occasions between December 10, 2004 and April 26, 2005. (R. at 222.) X-rays of Plaintiff's right hand were taken on June 6, 2005, which led to another surgery on May 2, 2006, when the fourth digit of Plaintiff's right hand was amputated and the third digit was subjected to a fusion procedure. (R. at 189.) Following this surgery, Plaintiff's recovery was monitored in a series of visits through the end of July 2006. (R. at 181–89.) During one such visit on July 24, 2006, Plaintiff began complaining of pain in his left wrist, and additional x-rays were taken. (R. at 182.) Also during this visit, Plaintiff's doctor ordered another surgery on Plaintiff's right hand to stabilize a tendon, although this surgery had not been performed prior to the administrative hearing. (*Id.*) Plaintiff received no further treatment for either hand since this time. (R. at 181, 366–67.) Plaintiff has no history of psychiatric treatment. (R. at 25–26, 383.)

2.    <u>Assessment of Physical Impairment</u>

As early as 1991, Plaintiff's injury caused him to suffer from a "clawed" right hand and muscle loss in his right forearm. (R. at 137.) In July 2004, doctors observed contracture deformities in the third, fourth, and fifth digits of Plaintiff's right hand as well as atrophied muscles. (R. at 142.) As a result, Plaintiff was diagnosed with ulnar clawing. (R. at 148.) On September 28, 2004, upon referral by the Bureau of Disability Determination Services ("DDS"), Plaintiff underwent a consultative examination by M.S. Patel, M.D. (R. at 149.) Dr. Patel noted that Plaintiff had full range of motion except for a mild-to-moderately weakened right grip. (R. at 151.) Dr. Patel observed mild to moderate atrophy of the small muscles in Plaintiff's right hand and forearm and also confirmed the contracture deformities in Plaintiff's right-hand fingers. (*Id.*)

On October 25, 2004, Charles Kenney, M.D., a DDS medical specialist, completed a physical residual functional capacity ("RFC") assessment for Plaintiff, concluding that Plaintiff could perform light work. (R. at 154–61.) Dr. Kenney determined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; could stand or walk for six hours and also sit for six hours; was not limited in his capacity to push or pull; had no postural limitations; and had manipulative limitations in his right hand. (R. at 155–57.) Dr. Kenney noted no other limitations. Dr. Kenney's RFC was later affirmed by another DDS specialist on March 4, 2005 during reconsideration of Plaintiff's SSI and DIB claims. (R. at 162.)

Plaintiff thereafter underwent surgery on May 2, 2006, and he also began complaining of left-hand pain. (R. at 182, 189.) At an administrative hearing held on July 11, 2007, Plaintiff testified that he had not received any treatment for the alleged pain in his left hand. (R. at 332–33.) The medical expert opined that a complete evaluation of Plaintiff's physical

- 5 -

impairment would not be possible without any clinical evidence, so the ALJ ordered Plaintiff to undergo an orthopedic consultative examination. (R. at 333–34.) Accordingly, Plaintiff was examined on August 17, 2007 by orthopedist James Elmes, M.D., and the report of his examination was given to the ALJ. (R. at 226, 232.)

Dr. Elmes noted early degenerative changes in Plaintiff's left hand and observed that Plaintiff's left-wrist x-rays appeared normal. (R. at 228.) Dr. Elmes's report confirmed prior medical opinions concerning Plaintiff's right extremities, including his decreased grip strength, muscle atrophy, and finger contractures. (R. at 230.) In the accompanying physical RFC assessment, Dr. Elmes noted that Plaintiff could occasionally lift and carry up to twenty-five pounds; could stand for two hours, walk for two hours, and sit for seven hours; could occasionally reach with both of his hands; was limited to occasional manipulations with his right hand; and could occasionally climb ladders, crouch, and frequently stoop and crawl. (R. at 233–35.) According to Dr. Elmes, Plaintiff should completely avoid unprotected heights, moving mechanical parts, humidity and wetness, and extreme cold. (R. at 236.) The ALJ adopted the entirety of Dr. Elmes's RFC assessment. (R. at 25.)

Plaintiff's physical RFC had been previously examined on October 20, 2005 by Nurse Practitioner Mary McLean, and her written report was also submitted to the ALJ. (R. at 176, 180.) Nurse McLean confirmed the same atrophy and clawing of Plaintiff's right hand, and she noted that Plaintiff suffered from a limited range of motion. (R. at 177.) According to Nurse McLean, Plaintiff's pain frequently interferes with his ability to concentrate. She also noted that Plaintiff can rarely lift items weighing less than ten pounds; has significant limitations with reaching, handling, or fingering; and is completely limited from using any of his hands, fingers, or arms to do work in an eight-hour day. (R. at 178–79.) The ALJ observed that Nurse

McLean's RFC was far more restrictive than all the other RFC reports, and the ALJ ultimately rejected this competing RFC assessment as inconsistent with the record. (R. at 25.) The ALJ noted that Dr. Elmes was a specialist who had Plaintiff's complete medical records. (*Id.*)

At the hearing on April 8, 2008, the ALJ heard testimony from medical expert Ernest Mond, M.D., who also adopted the entirety of Dr. Elmes's RFC assessment. (R. at 366.) Dr. Mond confirmed that Plaintiff's medical condition could reasonably cause his alleged pain. (R. at 360.) Dr. Mond opined that the early degenerative changes in Plaintiff's left hand were ubiquitous and not clinically significant, and he further testified that any pain therefrom would be minimal and could be managed with aspirin. (R. at 361.) Dr. Mond also considered the intensity of Plaintiff's alleged right-hand pain. (R. at 370–71.) Dr. Mond opined that Plaintiff's characterization of his pain as ten out of ten would indicate that he was in constant agony, akin to childbirth or passing a kidney stone. (R. at 371.) Dr. Mond noted that Plaintiff had not undergone any treatment since June 2006 and discredited his alleged pain because of the lack of specific medical attention for a year and a half. (R. at 371–72.)

### 3.    Assessment of Mental Impairment

On December 20, 2007, Plaintiff was evaluated by licensed clinical psychologist Mary Gardner, Psy.D., and her report, which included a mental RFC assessment, was submitted to the ALJ. (R. at 268.) In her RFC assessment, Dr. Gardner reported that Plaintiff had marked limitations in his activities of daily living ("ADL"); was moderately limited in his ability to maintain social functioning; and was moderately limited in his ability to maintain concentration, persistence, and pace. (R. at 289.) Dr. Gardner also included a form in which she indicated that Plaintiff meets the criteria for a 12.07 somatoform disorder based on persistent nonorganic

disturbances, noting that "[i]t is likely that some of his complaints have little or no organic basis." (R. at 273, 279, 285.)

At the hearing on April 8, 2008, the ALJ heard testimony from another medical expert, psychologist Ellen Rozenfeld, Psy.D.[3] After questioning Plaintiff, Dr. Rozenfeld agreed that Plaintiff has some psychological issues, but she disputed a number of Dr. Gardner's conclusions. (R. at 403.) Dr. Rozenfeld testified that Plaintiff does not actually meet the conditions for a somatoform disorder. (R. at 409.) She explained the requirements under 12.07, discussed various diagnostic criteria, and observed several ambiguities in Dr. Gardner's report. (R. at 403–11.) Furthermore, Dr. Rozenfeld opined that Plaintiff's restrictions in ADL are physically-based, not mentally-based, and his mental condition causes mild restrictions at best. (R. at 411.) Dr. Rozenfeld found moderate limitations in social functioning, which she based on Plaintiff's potentially distracting tendency to talk to others about his physical impairments. (R. at 411–12, 415.) She opined that this is Plaintiff's only antisocial limitation. (R. at 415.) Dr. Rozenfeld agreed that Plaintiff is moderately limited in his ability to maintain concentration, persistence, and pace. (R. at 412.) She observed that Plaintiff has the capacity to understand, remember, and concentrate on simple and detailed instructions; however, she testified that when Plaintiff's mind is not busy, he often pre-occupies himself with thoughts about his physical impairments. (R. at 412, 414.) Dr. Rozenfeld recommended that Plaintiff be kept away from detailed, complex work, but she clarified that Plaintiff's condition does not create any significant or marked limitation when he performs simple, repetitive work. (R. at 414.)

---

[3] The ALJ mistakenly refers to Dr. Rozenfeld as Ellen Rozenfeld, M.D. (R. at 26.) Also, the record and underlying briefs occasionally misspell her name as "Rosenfeld."

The ALJ agreed that Plaintiff's restrictions in daily living activities are physical in nature, not psychological, and she found that Plaintiff has moderate restrictions in social functioning and moderate restrictions in his ability to maintain concentration, persistence, and pace. (R. at 27.) In making these conclusions, the ALJ adopted the entirety of Dr. Rozenfeld's testimony, rejected Dr. Gardner's opinions concerning ADL, and only agreed with Dr. Gardner to the extent her opinions did not contradict Dr. Rozenfeld. (*Id.*) The ALJ noted that Dr. Gardner reviewed only twenty pages of Plaintiff's medical records and that her opinion was based on a single examination. (R. at 25.) The ALJ also remarked that Dr. Gardner reported three episodes of decompensation, which were wholly unsupported by the record. (R. at 26–27.)

### C. Plaintiff's Statements

#### 1. Statements Made in Conjunction with Medical Treatment

Plaintiff's alleged disability began on January 31, 2003. (R. at 38, 44, 304, 309.) On July 1, 2004, Plaintiff met with Dr. Jackie Cohen, complaining of an aching sensation in his right shoulder that extended down to his right wrist. (R. at 141.) Plaintiff described his pain as "an electric shock" that worsened in the cold but improved when warm. (*Id.*) Plaintiff also reported that his right hand "got tired," his right-hand grip was worsening, and his fingers felt weaker. (*Id.*) A resident nurse noted that Plaintiff had no other somatic complaints. (*Id.*) At the examination by Dr. Patel on September 28, 2004, Plaintiff again complained of recurrent numbness and intermittent pain in his right arm that worsened in rainy weather. (R. at 149.) Dr. Patel noted that Plaintiff had no other complaints and was not taking any medication. (R. at 149, 151.)

Plaintiff was referred to occupational therapy in July but did not begin treatment until December 10, 2004. (R. at 143.) On his intake questionnaire, Plaintiff complained of constant pain that had worsened over time and affected his sleep. (*Id.*) Plaintiff reported that he felt a sharp pain from his right shoulder down to his right hand and that he had been taking Tylenol. (R. at 144.) At that time, Plaintiff described the intensity of his pain as eight out of ten. (R. at 146.) At the orthopedic examination by Dr. Elmes, Plaintiff again complained of hand and wrist pain, the intensity of which, according to Plaintiff, was ten out of ten on his best days and his worst days. (R. at 226.) Plaintiff also complained of shoulder pain and described its intensity as five out of ten on his best and worst days. (R. at 227.) Plaintiff reported that weather changes exacerbate his hand and wrist pain, while moist heat, massage, rest, and Tylenol help relieve his pain. (R. at 226–27.)

### 2. Testimony Given at the Administrative Hearing

Plaintiff appeared at an administrative hearing before the ALJ and gave testimony concerning his employment history, his ADL, and the symptoms and limitations affecting his ability to work. At the time of the hearing, Plaintiff was forty-five years old. (R. at 392.) When asked why he could not work, Plaintiff cited difficulties in finding jobs that would accommodate his need to attend doctor's visits. (R. at 356.) Plaintiff explained that he had been fired from previous jobs because he frequently missed work to visit doctors. (R. at 353.) Plaintiff also testified that he is right-handed and that his injury causes him to work slowly. He admitted, however, that he could perform work if his employer could accommodate his physical limitations. (R. at 367.) For example, an employer would have to relax timeliness requirements for certain work, such as typing or filling out forms. (R. at 367–68.) Plaintiff testified that he

felt his only restriction was working in air-conditioned environments. (R. at 368.) Plaintiff also admitted that his pain does not interfere with his attention or concentration. (R. at 379–80.)

Plaintiff testified that he has difficulty working in cold environments because of increased pain from arthritis. (R. at 357, 374.) However, Plaintiff testified that he had not sought treatment for his pain since June 2006, explaining that he "[hadn't] experienced much pain" and "just accepted the healing the way it was." (R. at 367.) When asked why he had not visited a pain clinic since 2006, Plaintiff claimed he was not familiar with the concept of pain clinics; however, upon clarification, Plaintiff recalled being told about treatment options and testified that he avoided them because he did not want to take medication. (R. at 381–82.)

Plaintiff testified that he does not regularly take prescription pain medication and that he took prescribed pain medication only for a short time after his surgery. (R. at 314, 325, 385.) Beyond that, Plaintiff testified that he does take over-the-counter medication for his arthritis, explaining that he generally avoids medication because it gives him a rash. (R. at 366.)

Despite his condition, Plaintiff conducts various daily activities, albeit with some difficulty. Plaintiff testified that he does not need reminders for routine activities like bathing, taking medication, making a sandwich, using the microwave, or getting dressed. (R. at 384–85.) Plaintiff testified that he interacts a lot with his family and that he has conversations with people. (R. at 386.) Nonetheless, Plaintiff also described himself as a "loner" with limited friendships. (R. at 386–87.) Plaintiff testified that he attends church weekly and participates in a weekly, ninety-minute Bible study group, for which he reads at home to himself for an hour at a time. (R. at 388.) Plaintiff explained that when he is alone with his thoughts he often focuses on the circumstances surrounding his injury. (*Id.*) Plaintiff claimed to have a stable relationship with

his girlfriend. (R. at 396.) He also stated that he could support himself in theory but worries about finding work that could support him financially. (R. at 401–02.)

### D. VE's Testimony

At the hearing on April 9, 2008, the ALJ examined and heard testimony from vocational expert ("VE") Lee Knutson. (R. at 423–35.) Plaintiff's counsel had no objection to the qualifications of the VE. (R. at 343.) The VE was sworn and was present for the entirety of the hearing. (R. at 341, 342–43.) The ALJ instructed the VE to testify in conformity with the Dictionary of Occupational Titles ("DOT") and to identify and explain any deviations therefrom. (R. at 419, 423.) The VE began by asking Plaintiff questions about his work history. (R. at 419–23.) The VE then testified that all of Plaintiff's jobs in the fifteen years prior to the hearing were at least semi-skilled and required no more than light exertion. (R. at 424.) The VE also determined that Plaintiff's skills were limited to clerical work. (*Id.*) The ALJ then asked the VE to consider Plaintiff's age, education, background, work experience, and the physical limitations included in Dr. Elmes's RFC assessment.[4] (R. at 426–27.)

---

[4] The ALJ read Dr. Elmes's physical RFC assessment into the record as follows:

20/10; stand/walk, four; sit six. Right hand, only occasional reaching in front, only occasional gross, fine movement. Left, left appendage, occasional reaching in front, no limitations on fine or gross movement. For all of these, only occasional use of ladders, scaffolds. Frequent stooping, crawling. Only occasional crouching. No limits on balance, stairs, or kneeling. Then he has to avoid unprotected heights, moving mechanical parts, extreme cold, and can only occasionally drive.

(R. at 426–27.)

The VE concluded that the physical RFC would restrict Plaintiff to sedentary jobs and testified that if Plaintiff were limited to simple, unskilled work, he would be unable to perform any of his past work. (R. at 427–28.) The VE opined that Plaintiff could instead work as either an information clerk or surveillance system monitor. (R. at 427.) The VE testified that his assessment of surveillance system monitors was in conformity with the DOT but that his opinion on information clerks was a deviation. (R. at 428.) The VE explained that the DOT lists information clerks that are either unskilled and light or semi-skilled and sedentary but does not have a separate entry for information clerks that are both unskilled and sedentary. (*Id.*) Nevertheless, the VE attested to the existence of such jobs, which he based on his own placement experience and understanding of the market. (R. at 429.)

The VE then estimated that there are 1,700 information clerks and 2,000 surveillance system monitors in the Chicago metropolitan area that are both unskilled and sedentary. (*Id.*) In coming up with this figure, the VE explained that he took the Bureau of Labor Statistics data for all security personnel and for all information clerks and reduced each figure to five percent of the total number in order to account for only those positions that were unskilled and sedentary. (R. at 433.) According to the VE, these modifications were based on his personal knowledge and experience. (R. at 433–34.) Plaintiff's counsel objected to the VE's figures and specifically challenged the VE's ability to make those statistical modifications. (R. at 434.) The ALJ dismissed the objection and reminded Plaintiff's counsel that he had agreed to the VE's qualifications at the start of the hearing. (R. at 343, 434.)

Next, the ALJ asked the VE to consider the same physical RFC as before and an additional limitation requiring Plaintiff to work independently so as not to distract co-workers. (R. at 430.) The ALJ clarified that under this added restriction, Plaintiff could still have limited

interaction with the public. (*Id.*) The VE testified that Plaintiff could perform work as either an information clerk or surveillance system monitor, but the VE reduced his previously estimated figures by another ten percent and twenty percent, respectively. (*Id.*)

Finally, the ALJ asked the VE to consider the same factors up to that point but limit Plaintiff from all interaction with the public. (*Id.*) The VE responded that restricting Plaintiff from the public entirely would make him unemployable. (R. at 430–31.) The VE also testified that information clerks and surveillance system monitors would necessarily work in heated and air-conditioned environments, so the inability to work in those environments would also disqualify someone from those jobs. (R. at 432.)

### E.    ALJ's Findings

In an opinion dated May 22, 2008, the ALJ made the following findings of fact and conclusions of law:

> 1.   The claimant met the insured status requirements of the Social Security Act through September 30, 2008.
>
> 2.   The claimant has not engaged in substantial gainful activity since January 31, 2003, the alleged onset date.
>
> .    .    .    .
>
> 3.   The claimant has the following severe impairments: status post amputation to fifth digit, right hand; muscle atrophy to the ulnar aspect of right forearm, right hand and intrinsic muscles; distal interphalangeal ("DIP") and proximal interphalangeal ("PIP") contractures of second, third and fourth digits, right hand; early degenerative changes of the left hand; and reported history of a ruptured lumbar disc. The claimant has also been diagnosed with somatoform disorder, NOS.
>
> .    .    .    .

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

.   .   .   .

5.  . . . [T]he claimant has the residual functional capacity to perform sedentary work, as defined in 20 CFR 404.1567(a) and 416.967(a) except that he can lift 20 pounds occasionally and 10 pounds frequently; he can stand and walk 4 hours in an 8-hour day and sit 6 hours in an 8-hour day; he can perform occasional right hand reaching to the front and occasional gross and fine manipulation and push/pull with the right hand; he can use his left had [sic] occasionally for reaching to the front but has no limits on fine and gross manipulation or push/pull with his left hand.  He can occasionally climb ladders and ropes; frequently stoop and crawl with occasional crouching.  There are no limitations on balance, stairs or kneeling.  He must avoid exposure to unprotected heights, moving mechanical parts, and extreme cold.  He can occasionally drive.  Further, the claimant is limited to simple, unskilled work, and must work independently so he does not distract other employees.  He can have simple interactions with the public.

.   .   .   .

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born on April 1, 1962 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, the claimant can perform jobs existing in significant numbers in the national economy.

.   .   .   .

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 31, 2003 through the date of this decision.

(R. at 28–29 (citations omitted).)

### III. <u>Standard of Review</u>

Final decisions by the Commissioner may be reviewed in the district court. 42 U.S.C. § 405(g). Where the Appeals Council has declined to review the ALJ's decision, the ALJ's decision constitutes the final decision of the Commissioner. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). While legal conclusions are reviewed de novo, factual determinations by the ALJ will be affirmed if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The reviewing court may not re-weigh the evidence or substitute its judgment for the judgment of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).

The ALJ's decision need not address every piece of evidence in the record. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). However, the ALJ must articulate a logical bridge from the evidence to her findings so as to provide the claimant an opportunity for meaningful judicial review. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). This Court will reverse the ALJ's decision if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

# IV. **Discussion**

In order to qualify for DIB or SSI, a claimant must demonstrate that he is disabled. 42 U.S.C. § 423(a)(1)(E).[5] In order to determine whether a claimant is disabled under the statute, the ALJ employs a five-step, sequential evaluation. 20 C.F.R. § 404.1520(a)(4) (2009). At the first step, the ALJ must determine if the claimant is engaging in substantial gainful activity. (*Id.*) If not, the ALJ will proceed to the second step to evaluate whether the claimant's alleged impairment, physical or mental, is severe and medically determinable.[6] (*Id.*) If so, then the ALJ will proceed to the third step to assess if claimant's condition falls within the scope of certain listed impairments, pre-determined to be conclusively disabling. (*Id.*) If so, the claimant is disabled; otherwise, the evaluation continues. (*Id.*)

At this point, the ALJ must assess the claimant's RFC, which is applied in steps four and five. (*Id*). Step four requires the ALJ to evaluate whether the claimant's RFC limits him from engaging in past relevant work. (*Id.*) If so, the ALJ proceeds to the fifth and final step. At step five, the burden of proof shifts to the Commissioner to show "that other work exists in significant numbers in the national economy that [the claimant] can perform, given [claimant's RFC] and vocational factors." *Overman*, 546 F.3d at 464 (quoting 20 C.F.R. § 404.1560(c)(2)). If the Commissioner fails to meet this burden, then the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v).

---

[5] The definition of "disability" under Title II is incorporated verbatim into Title XVI, and determinations as to one apply equally to the other. *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). For simplicity, this opinion only refers to Title II provisions with the understanding that the analysis applies equally to both of Plaintiff's claims. *See id.*

[6] The impairment must also meet the durational requirement of 20 C.F.R. § 404.1509.

In this case, the ALJ reached step five by finding that: (1) Plaintiff had not engaged in substantial gainful activity; (2) Plaintiff suffered from severe impairments; (3) those impairments, taken individually or in combination, did not fall within the listed impairments determined to be conclusively disabling; and (4) Plaintiff could not perform any past relevant work. (R. at 19, 20, 28.) Neither party disputes these findings.

Plaintiff raises several challenges to the ALJ's decision. First, Plaintiff argues that the ALJ did not adequately account for Plaintiff's mental limitations. (Pl.'s Mem. 4–9; Pl.'s Reply Br. 1–7.) Second, Plaintiff claims that the ALJ disregarded medical evidence and wrongly discredited testimony relating to Plaintiff's capacity to work in air-conditioned environments. (Pl.'s Mem. 9–11; Pl.'s Reply Br. 7–11.) Third, Plaintiff argues that the ALJ failed to give sufficient weight to the combined effect of Plaintiff's physical and mental impairments. (Pl.'s Mem. 16–19.) Finally, Plaintiff challenges the reliability of the VE's testimony. (Pl.'s Mem. 11–13; Pl.'s Reply Br. 7–11.)

## A.  Accounting for Plaintiff's Mental Impairments

In assessing RFC, the ALJ concluded that Plaintiff is moderately restricted in social functioning and in his ability to maintain concentration, persistence, and pace. (R. at 27.) The ALJ also found that Plaintiff could perform simple, unskilled work as an information clerk or a surveillance system monitor, provided he works independently and only has limited interactions with the public. (R. at 29.) Plaintiff challenges the consistency of these findings. Plaintiff argues that (1) the ALJ's RFC assessment and VE's testimony failed to account for all of his mental limitations, and (2) the jobs the ALJ identified in step five are incompatible with the RFC assessment.

1.    The ALJ and VE Properly Accounted for Plaintiff's Limitations
      in Social Functioning and the Ability to Maintain Concentration,
      Persistence, and Pace.

At step five, the ALJ has the burden of proof to show that there are jobs in the national

economy that the claimant can perform based on the claimant's RFC. S.S.R. 96-8p. When

considering mental impairments, the ALJ must evaluate the functional consequences pertaining

to the claimant's ability to work. 20 C.F.R. § 404.1520a(a)(2). The ALJ must account for all

limitations supported by the record. *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004).

The ALJ may not categorically account for specific limitations in concentration, persistence, or

pace by merely restricting a claimant to unskilled work. *Craft*, 539 F.3d at 677–78 ("[U]nskilled

work . . . by itself does not provide any information about [claimant's] mental condition or

abilities."). When the ALJ relies on a VE's testimony, the VE must understand the full extent of

the claimant's disability. *Young*, 362 F.3d at 1003. Hypothetical questions posed to the VE

ordinarily must include all limitations supported by medical evidence in the record; however, the

ALJ's questions need not include every limitation if the VE learned of them independently

through other questioning at the hearing. *Id.* The ALJ may impute knowledge to the VE of any

limitations learned through prior testimony at the hearing and may assume that the VE included

all of these limitations in his assessment. *Steele*, 290 F.3d at 941.

Plaintiff first argues that any interaction with the public is incompatible with moderate

restrictions in social functioning. (Pl.'s Mem. 6.) The ALJ addressed this restriction by

requiring Plaintiff to work independently from his co-workers; however, the ALJ clarified that

Plaintiff could still have short interactions with the general public. Plaintiff questions how

someone with moderate restrictions in social functioning, and who cannot interact with

co-workers, can nevertheless have simple interactions with the public. (Pl.'s Reply Br. 3.) Plaintiff claims that the ALJ's findings are "conclusory" and lack explanation. (Pl.'s Mem. 6)

This argument is unavailing under the facts presented here. The ALJ's RFC assessment was crafted to comport with Dr. Rozenfeld's testimony that Plaintiff's social functioning is restricted only to the extent that he might distract others by obsessing over his physical impairment. (R. at 415.) The ALJ was therefore free to determine the extent of that distraction. The ALJ clearly felt that Plaintiff's particular brand of social dysfunction would only manifest itself through prolonged exposure to other people (i.e. co-workers). Dr. Rozenfeld did not suggest Plaintiff had a complete inability to interact with the general public, and there is substantial evidence in the record confirming Plaintiff's ability to work with the public, such as his recent employment helping others prepare tax returns. Indeed, Plaintiff never claimed to have lost a job because of his relationship with customers, and he regularly interacts with his family, members of his church, and his Bible study group. Accordingly, substantial evidence supports the ALJ's conclusion.

Second, with regard to limitations in concentration, persistence, and pace, Plaintiff claims that the ALJ's restriction to "simple, unskilled work" is legally insufficient. (Pl.'s Mem. 8.) Plaintiff is correct that unskilled work cannot categorically account for all limitations in concentration, persistence, or pace. In this case, however, the ALJ did consider the specific nature of Plaintiff's limitations by again relying on Dr. Rozenfeld's testimony. Dr. Rozenfeld testified that Plaintiff is able to concentrate on simple and detailed instructions. She opined that Plaintiff would not be limited in a marked, or even significant, way if he was restricted to simple work as opposed to detailed, complex work. Therefore, the ALJ did not simply treat unskilled

work as a general accommodation for Plaintiff's specific impairments. Instead, the ALJ reached her conclusion pursuant to the recommendations of a medical expert.

The Court notes that substantial evidence in the record indicates that Plaintiff is able to maintain concentration, persistence, and pace under certain conditions. The ALJ noted Plaintiff's ability to perform substantially gainful, semi-skilled work in the past. (R. at 27.) The ALJ was also free to observe Plaintiff's ability to focus on other activities, such as reading for his Bible study class and to consider Plaintiff's own testimony that his pain does not substantially interfere with his attention and focus. Under these facts, simple, unskilled work accounts for Plaintiff's restrictions in concentration, persistence, and pace. Therefore, the ALJ properly accounted for this limitation as well.

Nevertheless, Plaintiff disputes whether the VE and the ALJ were on the same page regarding Plaintiff's limitations, since the ALJ's hypothetical questions to the VE only mentioned "simple, unskilled work." Plaintiff argues that the ALJ's questions were "flawed," but he neglects to consider whether the VE could have learned of Plaintiff's impairments through other means. In this case, the VE heard the prior testimony given by Dr. Rozenfeld at the hearing, which was the same testimony on which the ALJ based her findings. The ALJ was allowed to assume that the VE incorporated Dr. Rozenfeld's testimony into his vocational assessments. Therefore, the ALJ's questioning of the VE was not erroneous.

As a final matter, the Court recognizes that for both of the mental restrictions discussed above, the ALJ ultimately relied on Dr. Rozenfeld's testimony and rejected competing evidence from the report of the examining psychologist, Dr. Gardner. An examining psychologist who does not have an ongoing treatment relationship with the claimant or whose report is requested for the purpose of supporting a disability claim is a non-treating source. 20 C.F.R. § 404.1502.

The ALJ is not required to give controlling weight to such a source. *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) (finding that a psychologist's report that was requested by claimant's attorney was not entitled to controlling weight.) The ALJ may discount medical opinions that are inconsistent with or unsupported by the record. (*Id.* at 515) (discounting psychologist's opinion that claimant was markedly limited in ADL when claimant did not disclose his regular personal activities to the psychologist.) Plaintiff's single visit with Dr. Gardner in December 2007 is insufficient to establish an ongoing treatment relationship. Furthermore, Plaintiff's attorney made the referral to Dr. Gardner for the purpose of assessing Plaintiff's disability claim. Accordingly, Dr. Gardner is a non-treating source, and her opinions are not entitled to controlling weight.

Additionally, the ALJ's decision to give less weight to Dr. Gardner's opinion is supported by substantial evidence. Dr. Gardner determined that Plaintiff's ADL was markedly restricted, but like the claimant in *Simila*, Plaintiff did not mention any activities, interests, or hobbies to Dr. Gardner. A marked restriction in ADL is also inconsistent with Plaintiff's testimony at the hearing. The ALJ noted Plaintiff's interactions with his family, his relationship with his girlfriend, and his regular church attendance. (R. at 271.) The ALJ also noted Dr. Gardner's unsupported findings of decompensation. (R. at 26–27.) Since Dr. Gardner's report contains inconsistent and unsupported assertions, the ALJ was justified in giving less weight to her opinions.

2.   Plaintiff's RFC Does Not Preclude Work as an Information
     Clerk or Surveillance System Monitor.

Next, Plaintiff argues that the ALJ's RFC assessment is inconsistent with the job

descriptions contained in the DOT.  The ALJ must take administrative notice of reliable job

information, such as that published in the DOT, 20 C.F.R. § 404.1566(d), but the DOT lists

"maximum requirements of occupations as generally performed, not the range of requirements of

a particular job as it is performed in specific settings." S.S.R. 00-4p, at 3.  The ALJ may use the

services of a VE to determine whether the claimant could perform specific work.  20 C.F.R.

§ 404.1566(d).  "A VE . . . may be able to provide more specific information about jobs or

occupations than the DOT." S.S.R. 00-4p, at 3.

Plaintiff quotes the DOT requirements for "Information Clerk," asserting that information

clerks must perform such tasks as answering customer questions and responding to requests for

information from company officials and other employees.  (Pl.'s Mem. 7.)  Plaintiff argues that

someone whose interaction with the public is limited cannot perform these tasks.  Furthermore,

Plaintiff contends that the level of reasoning required by information clerks and surveillance

system monitors is necessarily beyond the capabilities of someone restricted to unskilled work.

(Pl.'s Mem. 9.)

Plaintiff's arguments are unpersuasive because the DOT lists the *maximum* requirements

of various occupations, not their general requirements.  VEs are allowed to interpret whether a

claimant could nonetheless qualify for those occupations.  Plaintiff's lay opinion as to the

demands of a particular job cannot trump the VE's testimony.  The ALJ relied on the VE's

testimony, and Plaintiff did not object to the VE's expertise on vocational requirements.

Therefore, the ALJ's conclusions are not inconsistent with the DOT.

In conclusion, the ALJ and VE fully accounted for Plaintiff's mental restrictions, and the ALJ's step five findings are supported by the record.

## B.    Plaintiff's Capacity to Work in Air-Conditioned Environments

Next, Plaintiff claims that the ALJ erred by failing to account for his alleged pain in air-conditioned environments. When evaluating allegations of pain, the ALJ must consider objective medical and non-medical evidence and must determine the credibility of statements not corroborated by objective medical evidence. 20 C.F.R. § 404.1529(a) & (c)(4); S.S.R. 96-7p, at 2. Where the ALJ finds a claimant to not be entirely credible, the claimant's testimony regarding his impairment need not be accepted. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005).

In step five, the ALJ concluded that Plaintiff could work as either an information clerk or security surveillance monitor, and the VE testified that both jobs would require Plaintiff to work in air-conditioned environments. Plaintiff claims that his alleged impairment is corroborated not only by the medical evidence but also by his own statements, which Plaintiff argues were wrongly discredited. Therefore, the inquiry for this Court is two-fold: (1) whether the ALJ sufficiently addressed Plaintiff's alleged pain in air-conditioned environments to the extent required by the objective medical evidence and (2) whether the ALJ's adverse credibility finding is supported by the record.

1. The Objective Medical Evidence Does Not Preclude
Plaintiff From Work in Air-Conditioned Environments.

A claimant's allegations of pain are evaluated in a two-step process. The ALJ must first

determine whether there is an underlying physical impairment that could reasonably be expected

to produce the claimant's pain and must then evaluate the intensity, persistence, and limiting

effects of his symptoms. 20 C.F.R. § 404.1529(a); S.S.R. 96-7p, at 3. An ALJ needs to consider

only those impairments for which there is evidence. 20 C.F.R. § 404.1512(a). In assessing RFC,

the ALJ must give controlling weight to objective medical evidence. S.S.R. 96-8p, at 7. When a

claimant's alleged pain is not corroborated by medical signs and laboratory findings, the ALJ

must still consider "other evidence," 20 C.F.R. § 404.1529(a), including statements made by a

claimant to medical sources during examination or treatment as well as a claimant's testimony in

administrative proceedings. 20 C.F.R. § 404.1512(b)(3).

Plaintiff correctly points out that the ALJ may not ignore a claimant's complaints of pain

when it is consistent with the medical evidence. *Zurawski v. Halter*, 245 F.3d 881, 887–88 (7th

Cir. 2001). However, the ALJ here did not simply ignore Plaintiff's allegations. On the

contrary, she found that Plaintiff had medically determinable impairments that could reasonably

cause his alleged symptoms of pain. (R. at 27.) It is true that the ALJ's opinion does not

expressly discuss air-conditioned environments,[7] but then again, neither does the objective

medical evidence. The medical evidence attributes Plaintiff's pain to cold weather, and the ALJ

---

[7] Although Plaintiff claims that the ALJ failed to address the air-conditioning issue
entirely, this Court notes the following excerpt from the ALJ's opinion: "[Plaintiff] stated that he
had extreme and constant pain daily, which worsened in cold or rainy weather. [Plaintiff]
reported difficulty being in public places because *air-temperatures caused painful arthritic
flare-ups*." (R. at 22 (emphasis added)) Given its context, it is difficult to imagine that this
statement was intended to apply to anything other than indoor air-conditioned environments.

sufficiently discussed Plaintiff's claims. The ALJ adopted the opinion of Dr. Elmes, which noted that Plaintiff's arm pain increased with changes in the weather and concluded that Plaintiff can never tolerate "[e]xtreme cold." (R. at 226–27, 236.) The RFC conforms with this and expressly limits Plaintiff from extreme cold. (R. at 25, 26.)

The fact that Plaintiff cannot work in air-conditioned environments is not itself a medically-determined physical limitation; it is merely a potentially limiting effect of Plaintiff's pain in cold environments. Even though several medical reports note Plaintiff's sensitivity to air-conditioning specifically, this does not necessarily constitute corroboration by objective medical evidence. The Commissioner correctly observes that these items fall under "other evidence" pursuant to § 404.1529(a) since they derive from Plaintiff's own statements during treatment instead of medical signs and laboratory findings. (Def.'s Br. 8.) The ALJ, therefore, properly addressed Plaintiff's impairment to the extent required by the objective medical evidence. Since Plaintiff's alleged sensitivity to air-conditioning is not supported by objective medical evidence but derives solely from Plaintiff's own statements, this issue rests entirely on the credibility of those statements, as discussed below.

2.     The ALJ's Credibility Finding is Supported By the Record.

Even though Plaintiff's alleged pain in air-conditioned environments does not find support in the objective medical evidence, Plaintiff argues that his own statements corroborate his claim. However, the ALJ found Plaintiff not credible to the extent his statements regarding the persistence, intensity or limiting effects of his impairment conflicted with the RFC assessment. (R. at 27.) The ALJ articulated two reasons why Plaintiff's alleged pain was not credible: (1) Plaintiff did not regularly take medication to manage his pain, and (2) he had

significant gaps in treatment from 2004 to 2006 and has failed to seek treatment since then.[8] (R. at 27–28.)

An ALJ is not required to give full credit to every statement of pain. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994) (affirming adverse credibility finding when claimant offered no evidence of pain in air-conditioned environments and also gave contradictory testimony). A credibility determination is a finding of fact and, as such, is entitled to special deference from a reviewing court. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). In evaluating a claimant's allegations of pain, the ALJ must consider, among other factors, the intensity of claimant's alleged pain, any prescription medication claimant takes, any side-effects caused by the medication, and claimant's efforts to seek treatment for pain. S.S.R. 96-7p, at 3. "Inability to pay for medication or negative side effects from medication may excuse failure to pursue treatment." *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). Credibility depends largely on Plaintiff's consistency with the objective medical evidence and his own statements. (*Id.* at 5); *Sienkiewicz*, 409 F.3d 798 (affirming adverse credibility finding when claimant's complaints of extreme pain were in consistent with the findings of examining doctors). Because the ALJ is in the best position to observe witnesses and determine their truthfulness, the Court will only overturn the ALJ's credibility determination if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

Plaintiff admitted that he does not take prescription medication and only occasionally takes Tylenol to relieve pain. However, Plaintiff explained that he avoids medication because it

---

[8] The Commissioner argues that the ALJ also supported her decision by noting that Plaintiff had substantially gainful activity during the disability period. (R. at 27; Def.'s Mem. 6.) However, Plaintiff correctly observes that the ALJ's mere mention of this fact does not adequately articulate her reasoning for finding Plaintiff not credible. (Pl.'s Reply Br. 13.)

gives him a rash. The ALJ noted this explanation but did not inquire further. Even though the objective medical record does not show any evidence of a rash induced by medication, the ALJ arguably should have investigated this further to determine the credibility and severity of this alleged side-effect. The ALJ can certainly support an adverse credibility finding by observing that Plaintiff's alleged pain is worse than the alleged side effects of his medication. Although it is unlikely that any rash would be worse than agonizing pain, this Court hesitates to make such a generalized finding. Since the ALJ failed to fully develop this issue, it cannot be used to justify her adverse credibility finding.

Nevertheless, the ALJ's second reason for finding the Plaintiff not to be entirely credible – his sporadic treatment for pain – is sufficient to support the ALJ's finding. Plaintiff discontinued treatment after 2006 without explanation, and he admitted that he had not experienced much pain since that point. Plaintiff argues that he did not seek treatment for his pain because he did not know what a pain clinic was. However, this is inconsistent with his other testimony admitting that he was told about pain clinics but avoided them anyway. Plaintiff also has a history of seeking treatment for his pain, indicating that he knew medical therapies were available for his condition. In fact, Plaintiff initially sought treatment for his pain in 2004, and he testified that he often missed work to attend doctor's appointments for his pain.

Moreover, Plaintiff's self-described levels of pain are at odds with the medical record. Dr. Mond testified that the intensity of pain alleged by Plaintiff, if true, would put him in constant agony, and Dr. Mond himself doubted Plaintiff's credibility on this point. Also, Plaintiff had been referred to occupational therapy to relieve his pain, but he delayed treatment for four months. Furthermore, Plaintiff's alleged pain is inconsistent with his own testimony. Plaintiff believes that he is able to work and support himself provided certain conditions are met.

- 28 -

For instance, Plaintiff stated at one point that he believes that air-conditioning is his only limitation to working. He also testified that his arthritic pain worsens with colder temperatures. The ALJ was free to observe that these statements are inconsistent with constant pain of maximum severity.

Based on these inconsistencies, the ALJ's adverse credibility finding was not patently wrong. Because Plaintiff's alleged pain is not corroborated by the objective medical evidence, and because the ALJ's adverse credibility finding was supported by the record, the ALJ was not required to restrict Plaintiff from air-conditioned environments when assessing his RFC.

### C.    Aggregate Effect of Plaintiff's Impairments

Plaintiff further objects to the RFC assessment, arguing that the ALJ failed to consider the aggregate effect of his physical and mental impairments. The combined effect of multiple limitations can narrow the range of work that a claimant could perform. S.S.R. 96-8p, at 5. In assessing RFC, therefore, the ALJ must consider the combined effect of all impairments suffered by the claimant, even those that are not severe. 20 C.F.R. § 404.1523; *see Getch v. Astrue*, 539 F.3d 473 (7th Cir. 2008) (affirming RFC assessment where the ALJ stated he considered the claimant's impairments together along with the objective medical evidence). However, the ALJ may not completely ignore or mischaracterize evidence of an impairment that contradicts the ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 916–17 (7th Cir. 2003). The burden of proof is on the claimant to show that an impairment affects his ability to work on a sustained basis. 20 C.F.R. § 404.1512(a). When the record does not suggest that two conditions are intertwined, the ALJ need not speculate as to possible combined effects. *David v. Barnhart*, 446 F. Supp.2d 860, 876 (N.D. Ill. 2006).

As an initial matter, this Court notes that the RFC assessment includes both mental and physical limitations, and it does not suggest that Plaintiff's potential range of work is limited by only one type of impairment. The ALJ articulated at length the exertional limitations caused by Plaintiff's physical impairments before also considering Plaintiff's mental impairments. (R. at 21–24.) The ALJ stated that the RFC "takes the claimant's mental and physical impairments into account," (R. at 25.), and Plaintiff concedes that the ALJ considered both types of impairments "generally" and "individually." (Pl.'s Mem. 17, 18.) Instead, Plaintiff argues that the ALJ failed to address some additional degree of limitation created by the combination of his multiple impairments. (Pl.'s Mem. 17.)

At step three, the ALJ stated that she considered Plaintiff's "combination of impairments."[9] (R. at 20.) This Court is mindful that it cannot reject Plaintiff's argument based solely on the ALJ's *ipse dixit*; however, substantial evidence supports a finding that the ALJ considered the combined effect of Plaintiff's impairments when assessing RFC. The ALJ discussed the opinion of Dr. Ellen Rozenfeld, who attributed Plaintiff's mental impairments entirely to Plaintiff's physical condition. (R. at 27.) Dr. Rozenfeld explained that Plaintiff's moderate restrictions in social functioning are solely due to Plaintiff's tendency to distract others by telling them about his physical condition or his feeling that other people are looking at him. (R. at 415.) Furthermore, Plaintiff's restrictions in concentration, persistence, and pace are due to his tendency to focus on the circumstances surrounding his injury and his limitations. (R. at

---

[9] Even though the ALJ's statement is part of her step three assessment, this also shows that the ALJ considered the combined effect in assessing RFC. *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (affirming RFC based in part on ALJ's step three determination, which stated that claimant's impairments were considered "either singly or in combination."); 20 C.F.R. § 404.1512(a) (requiring the ALJ to consider "the combined impact of the impairments . . . throughout the disability determination process.").

412.) The ALJ's opinion notes Dr. Gardner's diagnosis of a somatoform disorder, a subject the ALJ also explored at the hearing. (R. at 403–15.)

Nevertheless, Plaintiff alleges that the ALJ erred by failing to recognize some *additional* limitation, arguing that the ALJ should have considered how Plaintiff's impairments might compound one another. (Pl.'s Mem. 19.) However, the record does not suggest this additional limitation, nor does the Plaintiff offer evidence of one. Plaintiff's support for his argument amounts to a mere restatement of his impairments, all of which were considered by the ALJ. There is substantial evidence that the ALJ addressed the interplay between Plaintiff's physical and mental impairments, and Plaintiff's disagreement with the ALJ's conclusion is not sufficient to require reversal.

### D.       Reliability of VE Testimony

Finally, Plaintiff argues that the VE did not provide any documents or reports to substantiate her estimate of the number of jobs in the local economy that are available to him. The ALJ's findings limit Plaintiff to "simple, unskilled work" with the additional limitations that Plaintiff must be sedentary and not have extensive interaction with the public. (R. at 21, 426-27.) In response to the ALJ's hypothetical question, the VE stated that these limitations reduced the available job categories to those of an information clerk and a surveillance monitor. As noted earlier, the VE deviated from the DOT's statistics for information clerks because the DOT lists such jobs as semi-skilled, a category outside the Plaintiff's abilities. Based on his own experience, the VE adjusted downwards the DOT's figures for available unskilled, sedentary clerks; estimating that only five percent of available jobs would be sedentary, the VE gave a figure of 1700 positions. (R. at 429.) He then reduced that figure by an additional 10 percent

based on the fact that Plaintiff cannot work with the general public. The VE further stated that 2,000 surveillance monitor positions at Plaintiff's skill level were available "by the DOT," (*id*.), a figure that he had also reduced to five percent of the total number of available jobs in order to accommodate the sedentary restriction. The VE once more reduced that figure by an additional 20 percent to account for the fact that Plaintiff must largely work alone. (R. at 430.)

The Court finds that the VE's testimony in this case was not sufficiently supported by substantial evidence. A vocational expert is allowed to deviate from the DOT, and an ALJ can accept such testimony if it is not challenged by one of the parties. *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). When, as here, the expert's testimony is challenged, the ALJ can adopt the expert's findings only after inquiring about its basis in a manner similar to, but less stringent than, expert examinations provided under Fed. R. Evid. 702. *Id.* As Rule 702 states, an expert's testimony is acceptable if it is based on "reliable principles and methods." Fed. R. Evid. 702. The Seventh Circuit has stressed that "the data and reasoning underlying the [VE's] bottom line must be available on demand if the claimant challenges the foundation of the vocational expert's opinions." *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2003) (internal quotation and citation omitted).

In this case, the VE's opinion testimony was based solely on his experience; the VE provided no specific data on the number of job candidates he had handled similar to the Plaintiff, the number of jobs available to such candidates, or the reasons supporting the VE's belief that the job market continued to provide jobs to sedentary, unskilled workers. "Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth." *Donahue*, 279 F.3d at 446. The Court recognizes that the VE may well have had the knowledge and expertise necessary to justify his job estimates, but he was required to respond to Plaintiff's challenge with more than a

vague reference to his own experience. If a vocational expert could justify his testimony merely by referring to personal experience, it is difficult to understand how such testimony could ever be meaningfully challenged or what *McKinnie*'s requirement of "the data and reasoning underlying" the expert's testimony would mean. *McKinnie*, 368 F.3d at 911. At a minimum, a vocational expert relying on personal experience, without any citation of objective reports or documents, must provide some specificity concerning the facts, figures, or other data that form the basis of his testimony.

The Commissioner contends that *McKinnie* does not apply to these facts because in that case the ALJ did not inquire into the reliability of the vocational expert's testimony. By contrast, the Commissioner argues, the ALJ here specifically asked the VE for the basis of his conclusion. The Court notes that the ALJ's question to the VE was merely "And where are you coming up with this opnion[?]" (R. at 429) The Court agrees that the ALJ properly inquired into the basis of the VE's testimony. The inquiry itself, however, is without significant meaning if it is met with an inadequate response from a vocational expert. In *McKinnie*, for example, the vocational expert cited Department of Labor Statistics, Census Bureau data, and her personal labor market surveys to justify her testimony. *See McKinnie*, 368 F.3d at 909. If reference to such data was insufficient in that case, the VE's even more vague reliance on personal experience, without more, is not enough here. Accordingly, the fact that the ALJ asked for the basis of the VE's job estimates is insufficient to distinguish this case from *McKinnie*.

The Commissioner also argues that the ALJ was entitled to rely on the VE's testimony because the Plaintiff agreed to the VE's expert qualifications at the hearing. This contention, however, creates a circular argument that would require an ALJ to accept all opinion testimony given by an expert merely because the parties have agreed to accept the witness as an "expert."

This may be true in hearings where no party questions the expert's testimony. *See Donahue*, 279 F.3d at 446 ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion [.]"). When it is challenged – as it was here – the Seventh Circuit clearly requires the ALJ to inquire into the reliability of the testimony. *McKinnie*, 368 F.3d at 911 ("A vocational expert is free to give a bottom line, but the data and reasoning underlying that bottom line must be available on demand if the claimant challenges the foundation of the vocational expert's opinions.") (internal quotation and citation omitted). The mere fact that a witness has expertise in a field is not, in itself, a sufficient ground for finding that all of that witness's testimony is reliable. *See Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989) (stating that an expert may not "offer[ ] the court his CV rather than his [expert] skills. Judges should not be buffaloed by unreasoned expert opinions.").

Accordingly, the Court finds that the ALJ should not have accepted the VE's unsubstantiated testimony regarding the number of jobs available to Plaintiff without further inquiry and investigation. The Court reverses the ALJ's decision on this issue and remands for further proceedings. On remand, the ALJ shall consider the data and records supporting the VE's testimony on the number of jobs available to Plaintiff in order to determine the reliability of such testimony.

## V.   Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Dckt. 18) and Defendant's Cross-Motion for Summary Judgment (Dckt. 20) are both granted in part and denied

in part. Accordingly, this matter is remanded for further proceedings consistent with this opinion.

ENTER ORDER:

_____
MARTIN C. ASHMAN
United States Magistrate Judge

**Dated:** September 1, 2010.